[No. 2912.]

G. J. MAKINSON v. THE STATE.

1. CONTINUANCE—CHANGE OF VENUE—BILLS OF EXCEPTION.—In the ab-
   sence of proper bills of exception, this court will not revise the action of
   the court below in refusing a continuance, and in overruling a motion to
   change the venue.
2. ROBBERY—CIRCUMSTANTIAL EVIDENCE—CHARGE OF THE COURT.—It is
   only in cases when the State relies solely upon circumstantial evidence to
   secure a conviction that the trial court is required to charge the princi-
   ples of law governing circumstantial evidence.
3. SAME—PRACTICE—NEW TRIAL.—When it appears that the alleged newly
   discovered evidence upon which a motion for new trial is predicated is
   not, in fact, newly discovered evidence, but was, or, by proper diligence,
   might have been, known to the defendant at the time of his trial, the new
   trial is properly refused, so far as that ground was concerned.
4. SAME—EVIDENCE—FACT CASE.—See evidence *held* sufficient to support a
   conviction for robbery.

APPEAL from the District Court of Travis. Tried below be-
fore the Hon. A. S. Walker.

The indictment charged the appellant with the robbery of the
Reverend R. K. Smoot, in Travis county, Texas, on the twenty-
fifth day of July, 1883. The means alleged was an assault with
a pistol, whereby the said R. K. Smoot was put in fear of bodily

harm. The appellant's trial resulted in his conviction, and his punishment was assessed at a term of five years in the penitentiary.

The first witness introduced by the State was the Reverend R. K. Smoot. He testified that he was a minister of the Presbyterian church, and had lived in the city of Austin for seven years. He was robbed of five silver dollars on the night of Wednesday, July 25, 1883. The point at which the robbery occurred was on West Pecan street, five blocks west of Congress Avenue, in the city of Austin. The witness, at the time, was on his way home from the city, and was riding alone in his buggy, the buggy top being thrown back. Detailing the particulars of the robbery, the witness said: "I was driving along slowly, with a man riding along horseback with me. When the saddle of his horse got about opposite the front wheel of the buggy, the man said: 'Stop!' He was then close to me. He asked me where Plum street was. I was about telling him, when he dropped a pistol on me and said: 'Your money or your life.' Witness replied: 'If left to me, I'll give my money, as I have but little;' and I told him I had five dollars, given me by a deacon that night. He then asked me of what denomination I was. I told him. He then said: 'You have a watch?' I replied 'Yes, but it will do you no good, as it is a present, and my name is engraved on it.' I gave it to him. He took it, examined it, and called for the money. I gave it, and he took it and said: 'You open your mouth, and I'll kill you.' Having the money, he galloped off, and I saw him no more. I gave him the money from fear. I think he would have shot if I had not given it. I think that I am satisfied in my own mind that that young man (pointing to the defendant) did it."

On cross-examination, the witness said that all of this occurred on a bright starlight night. The witness did not know, but had reason to believe that he once before saw the defendant at a point beyond the residence of Governor Pease, near the city of Austin. Of this, however, the witness was not absolutely certain. Referring to the occasion on which he believed that he saw the defendant previous to the night of the robbery, the witness said that he was driving along back of Governor Pease's place, hunting for the residence of Mr. Stelfox, junior. A wire fence on one side and a rail fence on the other formed a lane, at the end of which a water cart stood. Three men were sitting at the cart. Witness inquired of them the way to Mr. Stelfox's. One

of the men directed the witness and asked his business.  Wit-
ness replied that he was a minister, and was visiting as such.
The man then asked the time of day, and witness drew out his
watch and told him.  He then asked what denomination the
witness belonged to, and witness told.  Further conversation
with this man was excluded, and the witness said that without
repeating that conversation, he could not give his reason for
believing he had seen the defendant before the night of the rob-
bery.

At the time of the robbery, the witness remarked to the de-
fendant: "Young man, you will be caught, and I will be called
upon to identify you, and I have your voice well fixed in my
mind."  In talking with him afterward, the witness recognized
his voice.  Witness knew the defendant as the man he talked
with and identified in the jail.  The witness was familiar with
the voice of every man he had ever talked with, when he took
occasion to give it close attention.  He, witness, would swear
that he recognized the defendant by his voice, but not from his
personal appearance; and he believed that, by the voice, he
could recognize any one with whom he had ever held a conver-
sation.  The town clock struck nine just as the witness stepped
out of church that night.

On re-examination, the witness stated that he was morally
certain that the defendant was the man who robbed him on
that night.  On the day after the witness heard of the arrest of
the defendant, he went to the jail to see the defendant.  He told
sheriff Hornsby not to point the defendant out to him.  Witness
saw several prisoners, and spoke to one or two before he spoke
to the defendant.  The defendant hesitated before he would
talk to the witness, but when he did speak, the witness identi-
fied him.  He was the third man to whom the witness spoke in
the jail.  Witness was thoroughly satisfied that defendant was
the man who robbed him in the manner stated.  Sheriff Hornsby
was the only person present at the witness's interview with the
defendant in the jail.

At the time of the robbery, the defendant was riding a bay
horse about fifteen or fifteen and a half hands high.  Witness
took this animal to be a mare.  She was hardly so large as the
mare driven by the witness.  When defendant took the money
from witness's hand, he clucked to his animal and galloped off
east, leaving witness standing.  Witness afterwards drove off

west. The point at which the robbery occurred was between Rio Grande and Nueces streets.

Doctor R. M. Swearingen was the next witness for the State. He was of opinion that he first saw the defendant on the night of July 25, 1883, about nine o'clock, at the intersection of West Pecan and Rio Grande streets, in the city of Austin, Texas. Witness was then returning to town from a visit to a patient. When he first saw the defendant, the latter was standing still. Witness was driving slowly at the time, his horse being much fatigued. The defendant "sidled" up to the witness, and asked him directions to Peach street. An interview ensued. Witness stopped to think if he knew the location of Peach street, and defendant approached within three feet of him, and asked if the street on which they were was not West Pecan street. Witness answered in the affirmative. Witness's interview with defendant did not last over three or four minutes. Witness surveyed him as closely and as carefully as he could in the starlight. The form and shape of the man, his hat, clothing, and everything about him were noticed by witness as accurately as was possible under the circumstances. Witness looked at him carefully, with the view of remembering him in the future. This careful inspection of the defendant was made by witness at a distance of not more than three feet, and while the defendant was leaning toward witness. Witness charged his mind with his contour as he rode off, and did so for the purpose of fixing defendant in his mind. There was no moon and no clouds, but the night was bright starlight. The defendant wore, on the occasion of that interview, dark colored clothes and a large, heavy, broad brimmed hat. The witness took notice, but not as carefully, of his horse. He rode a high headed, long necked bay horse, about fifteen hands in height. The horse appeared somewhat jaded. The witness saw a weapon on the defendant, a large nickel plated revolver. Some eight or ten days after that interview, the witness met the defendant on the streets of the city of Austin, in charge of three or four officers, or guards, none of whom the witness knew. Witness followed this party to the court house, into the sheriff's room, where he had a conversation with the defendant, in the presence of the sheriff and others.

The watch and chain shown witness, as having been taken from the defendant, belong to the witness. Neither the watch nor chain was in witness's possession on the first day of August,

1883. They were recovered on that day, and were delivered to witness on the next day, August 2, 1883. A gentleman named Johnson returned the watch to the witness.

Asa Johnson was the next witness sworn for the State. He testified that he lived near Dripping Springs, in Hays county, Texas. He knew the defendant. Witness first saw the defendant on the twenty-eighth day of July, 1883, at the house of Bill Reevis, on Onion creek, in Hays county. Witness was one of the parties who arrested the defendant. Witness was at Reevis's shop on the evening of Saturday, July 28, 1883, when defendant came there. Defendant and one Burns sat on a wood pile for some time, talking. These two then went off into the peach orchard. On the following Tuesday the witness was deputised by the sheriff of Hays county to arrest the defendant anywhere he could be found. Witness was at Reevis's again on that Tuesday, on the evening of which day defendant came there again. Witness told Reevis about the defendant, and then went and got Jones and Burns to assist in making the arrest of defendant. Next morning witness and his party went into the room at Reevis's occupied by the defendant, and arrested him. The defendant was asleep, with his head covered up when witness went in to make the arrest. Burns called to the defendant to get up, and Jones uncovered his head. Defendant raised up and grabbed the barrel of a shot gun, at which he made two jerks. Defendant had just awakened, was excited, and did not know what he was doing. He released the gun when ordered to surrender, and when witness told him what he was arrested for, he demanded to see the papers upon which the arrest was made. Witness told him that he had no papers, whereupon the defendant threatened to prosecute witness if the arrest was made without papers.

The arresting party remained outside of the house during the night preceding the arrest, and did not go into the room until they made the arrest. When arrested, the defendant had a nickel plated pistol, a six shooter, under his pillow, on the floor. This occurred on the Tuesday following the Saturday the witness first saw the defendant, which was the Saturday before he was brought to Austin. On the day that the witness first saw the defendant, he was riding a bay mare about fifteen hands high. He rode the same or a similar mare on the Saturday of his last visit to Reevis's, which was the day before his arrest. After the arrest of the defendant, Reevis took defendant's pis-

tol, and searched his clothing, in which he found two watches and forty-nine dollars and a half, seven dollars and a half of which was in specie. Witness was not positive about the amount of specie, but the amount was, as he best remembered, about as stated. The greenbacks—forty-two dollars, as witness remembers—the two watches and the pistol, were retained, and the specie money given back to the defendant. Defendant at this time was dressed in a blue suit. Witness did not recollect the style or color of the hat he wore. He wore a different suit, gray in color, as the witness remembers, on the Saturday previous to his arrest. One of the watches taken from defendant was small in size, with a long gold chain, attached to which a charm in the shape of a compass and square was suspended. The other was an open faced brass watch, to which a somewhat worn hair chain was attached. A stain or black spot was on the chain of this watch.

Of the forty-two dollars in currency taken from the defendant, one bill was of the denomination of twenty dollars, two of ten, and two of one dollar. One of the tens was somewhat torn at a corner, to which a piece of writing paper had been pasted. A bill was exhibited, and was pronounced by the witness to be the same, according to his belief. Reevis and Jones accompanied witness and defendant to Kyle, and Lon Martin came with the party to Austin from Kyle. They turned the defendant over to sheriff Hornsby. One of the watches described the witness delivered to Doctor Swearingen, and the other to a gentleman named Henkle. The money was turned over to deputy sheriff Johnson; for which the witness took a receipt. Witness identified the two watches exhibited as those recovered from defendant and delivered by him to Doctor Swearingen and Mr. Henkle. Witness here gave minute reasons by which he was enabled to identify the watches, having also described them before they were handed to him for examination. Witness did not have the silver money in his hands at all, and did not knew the denomination of the several pieces. Witness did not notice whether or not defendant's horse was jaded when he rode up to Reevis's on the Saturday named.

W. T. Reevis was the next witness for the State. He testified that he resided on Onion creek, about five miles south of Dripping Springs. He first saw the defendant on the evening of Saturday, July 28, 1883. He was at that time, when the witness saw him, standing near a bay mare about fifteen hands

high.   Witness saw him next on the evening of Tuesday, July 31, 1883.   He was then riding the same animal.   He was dressed in a gray suit on Saturday, and on Tuesday he wore a blue suit, and, as the witness remembers, a light colored hat.   Witness was one of the parties who arrested the defendant.   The witness here substantially corroborated, in detail, the testimony of Asa Johnson as to the circumstances of the arrest, the recovery and disposition of the two watches, and the delivery of the defendant to the Travis county authorities.

The amount of money taken from the clothes of the defendant was forty-nine and a half dollars, of which forty-two were in currency—one twenty, two ten, and two one dollar bills—and seven and a half dollars in specie.   One of the ten dollar bills was torn and pasted at one corner.   This money witness turned over to officer Johnson, who delivered it to deputy sheriff Mat Johnson.   The specie money was left in possession of the defendant.   The defendant's horse was pretty well jaded when he came to witness's house on Tuesday evening.

H. L. Burns was the next witness introduced by the State. He testified that he lived near Dripping Springs, in Hays county. He saw the defendant on two occasions before seeing him in the court house on this trial.   The first time was on a Saturday about the twenty-seventh day of July, 1883.   He was then at W. T. Reevis's, on Onion creek, in Hays county, about twenty-four miles distant from Austin.   He was then on foot.   The witness saw him go into the orchard on that occasion.   The witness next saw him at Reevis's on Wednesday morning, about August 1, 1883.   Witness, Johnson and Jones arrested the defendant on that morning in the presence of Reevis.   Regarding the circumstances of the arrest and the removal of the defendant to jail at Austin, the testimony of the witness did not vary from that of Johnson and Reevis.   He corroborated those two witnesses as to the pistol, watches and money taken from the defendant, and identified the two watches which, he said, were subsequently delivered to Swearingen and Henkle.   The silver money was returned to the defendant.   Besides the blue suit of clothes, the defendant had on a gray suit, at the time of his arrest.   These he wore under the blue suit.   Witness did not notice the style of hat worn by defendant.

W. J. Jones testified, for the State, that he saw the defendant at Reevis's house, in Hays county, on Saturday, July 28, 1883, and again at the same place on the following Tuesday.   Witness

was one of the party that arrested him. The witness here narrated the circumstances of the arrest and confinement of defendant, the discovery of the pistol, money and watches on his person, and the subsequent disposition of the articles, substantially in accord with the narratives of the previous witnesses, and identified the watches and the mutilated ten dollar bill as fully as they were identified by the other witnesses. Reevis, he said, searched the defendant's clothing, which at the time of the arrest was lying at the head of his pallet. The suit of clothes was of navy blue cloth. He wore a pair of gray pants under his blue suit. His hat was white of color, with broad brim. Of the silver money, two or three pieces were in half dollars, the residue in dollar pieces.

James Talley was the next witness for the State. He testified that he lived in Llano county, Texas. He could not say that he did or did not know the defendant. He knew him from seeing him in the court room. before being called to testify. The witness was robbed by two men one night, but was unable to swear that he had ever seen the defendant before he saw him in the Travis county jail, and in the court house.

The witness was robbed, on the occasion referred to, about three miles distant from Austin, on the Burnet road. He was en route to Austin. and was camped at the time. It was about one or two o'clock in the morning. When the witness waked, two men, on horseback, were standing by him, each with a six shooter in his hand, and a third man, on horseback, was standing off some fifty yards distant. The defendant, if he was one of the men engaged in the robbery, was the one who rode a high headed bay horse, some fifteen or sixteen hands high. The two men near the witness got down from their horses, and a conversation of some five minutes duration ensued between witness and them. The man on the bay horse said nothing to the witness. The man who was with the rider of the bay animal picked up the witness's coat, pants and vest, and took from them all the money that the witness had. Their horses stood quite near the pallet on which the witness slept. If the defendant was the man who rode the bay horse, he had a pistol which the witness saw plainly, but which he could not describe. The same man pulled out a gold watch, which he said he had taken from a doctor in Austin. He stood some seven or eight feet from witness when he exposed the watch. Witness saw the watch. It was a small gold watch with a double link gold chain,

on the end of which was a charm in shape of a compass and square, and, the witness believed, an ornamental key, pendant. Witness identified the watch and chain, and said that he now saw that the part of the chain he took to be an ornamental key was a bar. After the remark about taking the watch from an Austin doctor, the men mounted their horses and rode off. The man who rode the gray horse wore a suit of gray clothes. If defendant is that man, witness next saw him in the Travis county jail. Witness would not positively swear that defendant was one of the men who robbed him.

Cross-examined, the witness stated that he did not point the defendant out in jail. Defendant was brought to him by the sheriff. In shape and size, the defendant resembles the man who took part in that robbery, and who rode the bay horse, as stated. The robbery of the witness occurred on the night of Friday July 27, or 28, or, rather, on Saturday morning, about two o'clock. Witness could not absolutely identify the defendant as one of the robbers, but felt confident and positive, in his own mind, that defendant was the man who rode the bay horse and participated in that robbery.

L. Henkle was the next witness for the State. He testified that he was a resident of the city of Austin. He had seen the defendant prior to this trial, once in justice Tegener's court room, and once in the room of the Travis county jailor. The witness could not say that the defendant was the same man who robbed him. He does not appear quite so tall or quite so old as that man, though the voice is very much or quite the voice of the man who robbed witness. If he could see the robber dressed as he was at the time of the robbery, and riding the same horse, the witness thought he could identify him, but he could not say that he ever saw the defendant before he saw him in justice Tegener's court room. The man who robbed the witness was, at the time, riding a bay horse of about an average size. He had a pistol that glistened in the moonlight. This robbery occurred about one o'clock at night, below Pressler's garden, on the continuation of West Pecan street, between the residences of Judge Sheeks and J. R. Johnson.

The ten dollar bill here shown to the witness, and said to have been taken from the defendant, is a bill that was taken from the witness on the night of the robbery. Before this bill was returned to the witness, witness selected it from four or five other bills handed him in the jailor's room. Witness also iden-

tified a watch taken from the clothing of the defendant as his watch, and as the same that was taken from him at the time of the robbery.

M. M. Johnson, chief deputy sheriff of Travis county, was the next witness for the State. He testified that he was the book-keeper of the sheriff. The defendant was placed in jail, as shown by the sheriff's record, on the first day of August, 1883. That record contains the defendant's name, the date of his arrest, the court by which he was committed, and the offense of which he is charged. From Asa Johnson, one of the officers who delivered the prisoner, the witness received forty-two dollars in currency, for which he gave Asa Johnson a receipt. These forty-two dollars the witness turned over to sheriff Hornsby. Witness remembered nothing about these bills, except their denomination. One was a twenty dollar bill, two were tens, and two were ones.

Defense admitted that this money was the identical money that Johnson, Reeves, Burns and Jones took from defendant in Hays county. The State closed.

C. F. Rumpel was the first witness for the defense. He testified that he was in the city of Austin from July 22 to July 26, 1883. He was in the city of Austin during the time that it was said that highway robberies were being committed upon the street, and at the time of the robbery of Doctor Smoot. A man coming toward West Pecan street pointed pistol at witness, for the purpose of robbing him, about ten o'clock in the morning, on the day after the robbery of Doctor Smoot and others. That man rode a fox or reddish bay colored horse. The defendant was not the man who attacked witness.

Sheriff M. M. Hornsby testified, for the defense, that the defendant came into his charge on the last day of August or first day of September, 1883. He had a horse, but witness knew nothing of that horse, of his own knowledge. He had a bill of sale of a horse, which witness sent to the foreman of the grand jury.

H. Younger testified, for the defense, that he was fifty-four years old. He had had some experience in identifying persons. He knew nothing about identifying people by the voice. He had never had occasion to try such experiment.

H. G. Thompson was the next witness for the defense. He testified that he lived in Uvalde county, Texas. He had known the defendant for three or four years. The defendant is sixteen

years old, and perhaps a few months older. The defendant worked about six months for the witness, and witness was well acquainted with his reputation for honesty. The defendant worked for the witness on a sheep ranch, and had many and ample opportunities to steal from the witness, and never stole anything that the witness ever knew or heard of. His reputation for honesty was good in Uvalde county. His character generally was good in that county. He had two horses when he left the witness's place. His father owns a few head of cattle, but is rather a poor man.

Cross-examined, the witness stated that the defendant was his wife's brother. Witness came to Austin to testify in this case, and has been in the city, brought and kept here by attachment, for five or six weeks. When defendant left witness's house he went to Mr. Wilson's house, in Burnet county, where he remained through the lambing season, and leaving there, the witness believed, some time in April, 1883. He left witness's house in March, 1883. He left to hunt a horse that he believed had strayed to Burnet county. Witness did not see him again until he saw him in custody in Austin.

Mrs. Makinson, the mother of the defendant, testified that he was born on the twenty-seventh day of May, 1867.

The motion for new trial raised the questions discussed in the opinion, denounced the action of the court in refusing special charges asked, and the verdict as contrary to law and evidence.

*Walton & Hill*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. There are no bills of exception in the record to any ruling or action of the trial court. We are therefore not required to consider whether or not there was error in overruling defendant's application for a continuance, or the refusal of his motion for a change of venue. (Code Crim. Proc., Art. 686; Clark's Crim. Law, p. 523, note 209.)

2. It is only in cases where circumstantial evidence *alone* is relied upon by the State to obtain a conviction, that the trial court is required to instruct the jury as to the principles of law concerning that character of evidence. (*Tooney* v. *The State*, 8 Texas Ct. App., 452; *Hardin* v. *The State*, Id., 653.) In a case where the testimony establishing the commission of the offense

by the defendant is both direct and circumstantial, such instructions are not demanded. In the case under consideration there was not only strong circumstantial evidence proving the defendant's guilt, but there was direct, positive and convincing proof that he was the identical party who committed the robbery charged in the indictment. It was not error, therefore, for the court to omit and refuse to charge the jury in relation to circumstantial evidence. We think the charge of the court was in all respects full, fair, correct and applicable to the evidence.

3. We find no error in the refusal of defendant's motion for a new trial. As to the alleged newly discovered evidence, the facts in regard thereto, as stated in the motion, show conclusively that it was not newly discovered, but must have been, or would have been by the use of reasonable diligence, within the knowledge of the defendant at and before the trial. This ground of the motion is entirely insufficient, and without merit.

We have examined the other grounds of the motion for new trial, and in our opinion none of them are supported by the record. That the verdict of the jury is fully sanctioned by the evidence there can be no question, and in all respects we believe the conviction to be legal and just.

The judgment is affirmed.

*Affirmed.*

Opinion delivered April 30, 1884.